UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

FORD MOTOR CREDIT COMPANY LLC,   )
                                  )
                    Plaintiff,    )
                                  )
vs.                               )
                                  )  Case No.: 1:19-CV-00502-HAB-SLC
                                  )
FINCANNON FORD, INC., f/k/a       )
FINCANNON FORD-MERCURY, INC.,     )
LINDA MUGHMAW, a/k/a              )
LINDA FINCANNON,                  )
MATTHEW FINCANNON, and            )
STANLEY BOURFF,                   )
                                  )
                    Defendants.   )

**BRYAN W. BANKS' DECLARATION IN SUPPORT OF PLAINTIFF FORD MOTOR CREDIT COMPANY LLC'S MOTION FOR DEFAULT JUDGMENT**

BRYAN W. BANKS, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I am employed by Ford Motor Credit Company LLC ("Ford Credit') as a Regional Manager for the Cincinnati Region.

2. I submit this Declaration in support of Ford Credit's motion for entry of a default judgment against defendants Matthew Fincannon ("Mr. Fincannon") and Stanley Bourff ("Mr. Bourff").

3. The information in this Declaration is based upon my knowledge of Ford Credit's practices and procedures as well as my review of Ford Credit's business records with respect to: Fincannon Ford, Inc., f/k/a Fincannon Ford-Mercury, Inc. ("Fincannon Ford" or the "Dealership"); Linda Mughmaw a/k/a Linda Fincannon, its guarantor ("Ms.

Mughmaw" or "Guarantor"); its former principal-in-fact and Chief Executive Officer, Mr. Fincannon; and its former manager, Mr. Bourff.

4. The Ford Credit documents identified in this Declaration, and those attached as exhibits, are business records that were made and kept in the ordinary course of Ford Credit's regularly conducted business, and were made and kept by individuals at Ford Credit whose duty it was to make and keep such records and to accurately report the information and amounts recorded therein in a timely fashion.

## BACKGROUND

5. My duties as a Regional Manager include monitoring dealerships in the Cincinnati region and assisting with Ford Credit's response following a default by a dealership that has financed its vehicle inventory, or has received other financing, through Ford Credit.

6. When such a default occurs, and is not promptly cured, Ford Credit declares a "status" and implements controls to protect the vehicle inventory and other collateral that is subject to Ford Credit's security interests.

7. Ford Credit also tracks all amounts paid to it by dealerships after the status is declared, received by Ford Credit from the sale or other disposition of collateral subject to Ford Credit's security interest, and expended by Ford Credit in administering the status and pursuing the collection of any outstanding amounts owed to it.

8. In this case, I was personally involved with Ford Credit's response to the defaults that occurred at Fincannon Ford, as well as Ford Credit's efforts to secure and then liquidate its collateral after those defaults.

## THE DEFAULTS BY FINCANNON FORD
## AND THE FRAUD PERPETRATED AGAINST FORD CREDIT

9. On or about November 4, 2019, Ford Credit conducted an audit of the vehicle inventory at the Dealership, and identified a number of vehicles that the Dealership had sold, and for which it owed payment to Ford Credit.

10. As a result, the Dealership authorized an electronic funds transfer ("EFT") to Ford Credit in the amount of $1,008,747.56.

11. On or about November 7, 2019, that EFT was returned for non-sufficient funds.

12. The Dealership was then out of trust, having sold vehicles that were subject to Ford Credit's security interests without remitting proceeds from those sales to Ford Credit as and when they were due.

13. Further inventory audits, conducted on November 8, 2019 and November 11, 2019, identified additional vehicles that were also sold out of trust by the Dealership.

14. As of November 13, 2019, the Dealership's total Sold Out of Trust ("SOT") balance was approximately $1,300,000.00.

15. Ford Credit meanwhile discovered that Mr. Fincannon and Mr. Bourff had arranged for, directed, and caused Fincannon Ford to misrepresent sales dates for certain vehicles it sold, in an apparent attempt to delay (by many months) or to avoid payment of amounts due to Ford Credit upon the sale of said vehicles.

16. As specific examples, but without limitation, Fincannon Ford misrepresented the sale dates for at least three (3) of the SOT vehicles. The table below summarizes these sales and Fincannon Ford's misrepresentations concerning the same:

|   | VIN (Last 8) | Dealer's Stock Number | Sales Dates(s) Reported/Submitted to Ford Credit | Date Sold Per Dealer's Records | Payment Received by Dealer, Per Dealer Records | Wholesale/SOT Balance |
|---|---|---|---|---|---|---|
| 1 | KDF01554 | T1912 | 11/4/2019 | 9/25/2018 | 10/17/2018 | $45,994.08 |
| 2 | KDF05164 | T1945 | 11/4/2019 | 1/15/2019 | 5/2/2019 | $46,077.04 |
| 3 | KDF06606 | T1955 | 11/4/2019 | 4/1/2019 | 4/18/2019 | $48,492.04 |

17. Ford Credit also learned that, at the direction of Mr. Fincannon and Mr. Bourff, Fincannon Ford submitted false monthly financial reports to Ford Credit, which significantly overstated the dealership's cash on hand and failed to disclose factoring agreements between the Dealership and other entities.

18. Specifically, Ford Credit learned that Fincannon Ford had entered into an agreement with a first factor, pursuant to which Fincannon Ford pledged to pay 25% of its future receipts to that factor (up to a total of $524,625.00), pledged assets that were a part of Ford Credit's Collateral as security (and allowed that factor to encumber such assets and file UCC liens against them), and received $375,000.00 in return. A copy of this agreement, obtained by Ford Credit from Fincannon Ford, is attached as **Exhibit A**.

19. Ford Credit also learned that Fincannon Ford had entered into an agreement with a second factor, pursuant to which Fincannon Ford pledged to pay 25% of its future receipts to that factor (up to a total of $559,600.00), pledged assets that were a part of Ford Credit's Collateral as security (and allowed that factor to encumber such asserts and file UCC liens against them) and received $400,000.00 in return. A copy of this agreement, also obtained by Ford Credit from Fincannon Ford, is attached as **Exhibit B**.

20. Fincannon Ford also falsely reported the cash-on-hand at the dealership to Ford Credit, and failed to disclose the true cash-on-hand, by keeping a separate ledger

(which did not reflect these factoring arrangements, as well as other relevant financial information).

21. Ford Credit has also learned that Mr. Fincannon and Mr. Bourff used the dealership for their personal gain, as they used dealership funds to pay personal expenses.

22. As detailed in Ford Credit's Second Amended Complaint, which I have reviewed and incorporate by reference, the conduct outlined above, including the sale of vehicles out of trust, the return of the electronic funds transfer, misrepresentations of sale dates, submission of false financial statements, and the existence of and failure to disclose the factoring arrangements constituted violations of Fincannon Ford's agreements with Ford Credit, and were defaults under those agreements. True and correct copies of the Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement and the Security Agreement between Fincannon Ford and Ford Credit are attached as **Exhibits C** and **D**, respectively.

23. At the time these defaults occurred, Mr. Fincannon and Mr. Bourff, as Fincannon Ford's Chief Executive Officer and General Manager, exercised day-to-day control over Fincannon Ford's daily operations.

24. Ford Credit relied on the false financial information provided to it by Fincannon Ford, at Mr. Fincannon's and Mr. Bourff's direction, in continuing to provide financing to Fincannon Ford – which Fincannon Ford was ultimately unable to repay.

25. On or about November 8, 2019 and November 12, 2019, Ford Credit sent demand letters to Fincannon Ford and the Guarantor, demanding immediate payment of the outstanding balance then owed to Ford Credit, including for the vehicles sold out of trust. True and correct copies of Ford Credit's demand letters are attached as **Exhibit E**.

26. As of November 12, 2019, Fincannon Ford owed $4,640,696.65 to Ford Credit.

## SALE OF COLLATERAL

27. In November 2019, Fincannon Ford surrendered the Collateral, which was then sold at auction.

28. The net proceeds from the auction of the Collateral were applied to Fincannon Ford's indebtedness under the Wholesale Agreement, but a deficiency of $1,346,196.22 remained outstanding as of August 10, 2020 (inclusive of interest calculated through that date).

## INDEBTEDNESS

29. As of August 10, 2020, the total amount owed by Fincannon Ford to Ford Credit (inclusive of interest calculated through that date, but excluding legal fees and expenses incurred by Ford Credit), was $1,346,196.22, including:

    a) $974,863.32 for financing provided under the Wholesale Agreement that was not repaid;

    b) $$254,067.70 in unpaid interest through August 10, 2020;

    c) $117,265.20 for expenses incurred by Ford Credit to secure and sell the Collateral.

October 16, 2020

_____
Bryan W. Banks