## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

FORD MOTOR CREDIT COMPANY LLC,    )
                                  )
        Plaintiff,                )
                                  )
v.                                )        Cause No. 1:19-CV-502-HAB
                                  )
FINCANNON FORD, INC., f/k/a       )
FINCANNON FORD-MERCURY, INC., and )
LINDA MUGHMAW, f/k/a LINDA        )
FINCANNON,                        )
                                  )
        Defendants.               )

## OPINION AND ORDER

In November 2019, Plaintiff Ford Motor Credit Company LLC ("Ford") declared Defendant Fincannon Ford, Inc., f/k/a Finacannon Ford-Mercury, Inc. ("FFMI"), in breach of certain financing agreements and Defendant Linda Mughmaw, f/k/a Linda Fincannon ("Mughmaw"), in breach of a personal guaranty. The breaches are largely undisputed, but Ford's ability to recover for those breaches is not. FFMI and Mughmaw assert that Ford waived any rights under the financing agreements by failing to assert prior breaches of which Ford was, allegedly, aware. Separately, Mughmaw denies ever signing the personal guaranty. Now before the Court are competing motions for summary judgment by all parties. (ECF Nos. 68, 73, 76). The motions are now fully briefed (*see* ECF Nos. 69, 70, 74, 75, 77–83) and are ripe for determination.

### A.    Factual Background

The roots of this dispute stretch back to 1986 when FFMI executed and delivered to Ford an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement (the "Wholesale Agreement"). (ECF No. 68-8). Under the terms of the Wholesale Agreement, Ford would extend credit to FFMI to allow FFMI to purchase new and used vehicle inventory. In return,

the Wholesale Agreement required FFMI to pay to Ford, "without demand, the unpaid balance of the Advance made by Ford Credit hereunder with respect to an item of the Merchandise at or before the date on which the same is sold, leased or placed in use by Dealer." (*Id*. at 2). Stated another way, when FFMI sold a vehicle, it had to pay Ford back for the money loaned to FFMI to purchase the vehicle at wholesale.

Within the Wholesale Agreement are several safeguards intended to ensure that Ford was repaid. FFMI was required to maintain insurance on its vehicle inventory. FFMI was required to provide periodic reports to Ford regarding its financial condition. FFMI could not encumber the inventory with any other indebtedness. Finally, Ford took a security interest in FFMI's vehicle inventory.

The Wholesale Agreement set forth four events of default: (1) failure by FFMI to make payments when due and owing; (2) failure by FFMI to comply with any other term of the Wholesale Agreement; (3) making false or misleading representations to Ford; and (4) bankruptcy by FFMI. Ford was given a myriad of rights in the event of a default, including acceleration of debt payments, seizure and sale of FFMI's vehicle inventory to satisfy outstanding debt, and collection of attorney fees incurred in enforcing its default rights.

On the same day the Wholesale Agreement was executed, Michael Fincannon (now deceased) and Mughmaw (allegedly) executed a Continuing Guaranty (ECF No. 82-3). The Continuing Guaranty made Michael Fincannon and Mughmaw personally responsible for all sums owed to Ford by FFMI in the event of FFMI's default on the Wholesale Agreement. The Continuing Guaranty bears the signature of a witness who was also the individual that notarized the signatures on the Wholesale Agreement.

2

In 1998, FFMI executed a Security Agreement (ECF No. 82-2). The Security Agreement gave Ford a security interest in essentially all FFMI's property. The Security Agreement further gave Ford the right to seize and sell the property in the event of a default by FFMI on any obligation to Ford.

According to Defendants, FFMI's monthly statements going back to 2012 showed that FFMI was suffering from considerable difficulties. Defendants claim that those statements showed that FFMI had a large negative balance on the value of the vehicles in its inventory and that FFMI was struggling financially. Thus, Defendants assert, "[n]o later than December 2012, Ford Credit knew or should have known that Fincannon Ford was operating 'out of trust' based on the monthly financial statements provided to Ford Credit." (ECF No. 75-8 at 3).

Years of poor financial statements apparently did not deter Ford from making additional loans to FFMI under the Wholesale Agreement. Ford continued to finance FFMI's vehicle inventory, and increased FFMI's line of credit in mid-2019. At no point from 2012 through late 2019 did Ford declare a default of the Wholesale Agreement or exercise any rights under that Agreement.

To obtain additional funding for FFMI, Mughmaw, on behalf of FFMI, executed two factoring agreements in the summer and fall of 2019. (*See* ECF Nos. 68-10 and 68-11). In essence, FFMI agreed to accept a lump sum payment from two financial companies in exchange for FFMI's pledge to pay those companies twenty-five percent of future revenues up to a specified amount. FFMI also gave the companies a security interest in roughly the same property covered by the Security Agreement; that is, essentially all FFMI's property. According to Defendants, these factoring agreements were entered into because Ford demanded that FFMI obtain additional capital to improve FFMI's financial condition. FFMI further claims that most of the money

3

obtained from the factoring agreements was paid to Ford. Finally, FFMI asserts that Ford must have known that FFMI would be forced to resort to factoring agreements for funding, as those agreements would have been FFMI's only source of funding considering its financial condition.

Ford conducted an audit in November 2019 that identified several vehicles for which FFMI had failed to remit funds upon sale. FFMI agreed to make good on its obligations to Ford through an electronic funds transfer ("EFT") in the amount of $1,008,747.56. The EFT was returned for non-sufficient funds. Two subsequent audits identified vehicles for which FFMI had failed to remit funds upon sale, for a total balance of $1,296,056.56 owed to Ford.

It appears that Ford then subjected all FFMI's books to additional scrutiny. This analysis discovered that FFMI misrepresented sales dates for at least three vehicles to delay or avoid payments to Ford. Ford also discovered that FFMI had submitted false monthly financial reports that failed to disclose the factoring agreements and falsely reported cash-on-hand. Finally, Ford discovered that FFMI kept a second set of books that accurately reflected its financial situation. Viewing FFMI's conduct as breaches of the Wholesale Agreement, Ford sent two letters, on November 8, 2019, and November 12, 2019, demanding payment of the outstanding balance then owed to Ford, including the amounts for vehicles sold out of trust.

According to Mughmaw, the demand letters were the first time she had heard about the Continuing Guaranty; she states that she was never told about the Continuing Guaranty prior to receiving the letters. Nonetheless, after receiving the letters, Mughmaw began communicating with a Ford employee named Deborah Drabek. Drabek was a Financial Services Specialist, responsible for monitoring FFMI's operations to protect Ford's collateral. The two women provide different interpretations of their communications.

Mughmaw claims that "each conversation with Drabek left Mughmaw confused . . . because Mughmaw did not know about the operations of" FFMI. (ECF No. 77 at 6). Mughmaw states that she referred questions about the Continuing Guaranty to the current operators of FFMI, former Defendants Matthew Fincannon and Stan Bourff. Both of those men have submitted affidavits in which they state that they never heard Mughmaw admit to signing the Continuing Guaranty.

For her part, Drabek claims that Mughmaw never seemed confused or unsure about the topic of their conversations. Drabek asserts that Mughmaw "realized she was the only one who had signed 'on the dotted line,' and expressed concern that the Dealership's default would impact her financially." (ECF No. 81 at 7). Drabek further claims that Mughmaw spoke intelligently about the financial condition of FFMI, discussing with Drabek attempts to obtain a mortgage on the property and the signing of the factoring agreements. At no point, according to Drabek, did Mughmaw ever deny signing the Continuing Guaranty.

Having received no payment in response to its demand letters, Ford took over FFMI to secure the amounts it was owed under the Wholesale Agreement and the Security Agreement. Following the initiation of this lawsuit, FFMI turned over to Ford those items it had pledged as collateral under the parties' agreements. Ford claims that the collateral was sold at auction in a commercially reasonable manner, with the proceeds applied against FFMI's indebtedness. FFMI disputes this claim, noting that it was excluded from any information regarding the sale of the collateral and that Ford has failed to account for any amounts obtained from the sale of the collateral.

**B.**      **Legal Analysis**

**1.**      ***Summary Judgment Standard***

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**2.     *Genuine Issues of Material Fact Exist with Respect to the Authenticity of Mughmaw's Signature on the Continuing Guaranty***

"A guaranty is defined as 'a promise to answer for the debt, default, or miscarriage of another person.'" *S–Mart, Inc. v. Sweetwater Coffee Co.*, 744 N.E.2d 580, 585 (Ind. Ct. App. 2001) (citation omitted). "It 'is an agreement collateral to the debt itself and represents a 'conditional promise' whereby the guarantor promises to pay only if the principal debtor fails to pay." *Id.* (citation omitted).

A continuing guaranty is defined as a guaranty that:

> "contemplates a future course of dealing encompassing a series of transactions.... [A] contract is continuing if it contemplates a future course of dealing during an indefinite period, or if it is intended to cover a series of transactions or succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time. A continuing guaranty covers all transactions, including those arising in the future, which are within the contemplation of the agreement."

38 Am.Jur.2d Guaranty § 20 (1999); *see also Vidimos, Inc. v. Vidimos*, 456 N.E.2d 455, 458 (Ind. Ct. App. 1983) ("continuing guaranty is not limited to single transaction, but contemplates a future course of dealing encompassing a series of transactions"). Moreover, a continuing guaranty "is not limited in time or amount and is operative until revoked." 49 Am.Jur.2d Landlord and Tenant § 819 (1995).

The rules governing the interpretation and construction of contracts generally apply to the interpretation and construction of a guaranty contract. *Kordick v. Merchants Nat'l Bank & Trust*

7

*Co. of Indianapolis*, 496 N.E.2d 119, 123 (Ind. Ct. App. 1986). The extent of a guarantor's liability is determined by the terms of his or her contract. *Id*. The terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within its terms. *Id*. The contract of a guarantor is to be construed based upon the intent of the parties, which is ascertained from the instrument itself read in light of the surrounding circumstances. *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 776 (Ind. Ct. App. 1984); *Orange–Co., Inc. v. Brown*, 393 N.E.2d 192, 195 (Ind. Ct. App. 1979).

A guarantor's liability will not be extended by implication beyond the terms of his or her contract. *Goeke v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 467 N.E.2d 760, 765 (Ind. Ct. App. 1984). "A guarantor is a favorite in the law and is not bound beyond the strict terms of the engagement. Moreover, a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties." *Id*.

The parties do not dispute the terms of the Continuing Guaranty, its scope, or the debt it secures. Instead, their dispute addresses whether there is a Continuing Guaranty at all. Mughmaw asserts, under oath, that she did not sign the Continuing Guaranty. Drabek claims, also under oath, that Mughmaw admitted to "signing on the dotted line" and that Mughmaw was concerned how FFMI's default would affect her personal finances. This is, for all intents and purposes, the width, length, and breadth of the evidence before the Court.

To say that the Court is underwhelmed by the factual presentation of both parties would be an understatement. In nearly every case the Court can find, parties contesting the authenticity of signatures at the summary judgment stage have provided significantly more evidence supporting their positions. *See*, *e.g.*, *United States v. Binzel*, 907 F.2d 746, 747–49 (7th Cir. 1990) (moving party submitted affidavit of individual that witnessed execution of guaranty, established chain of

custody for the guaranty, and demonstrated that the guaranty signed was the same guaranty produced in discovery; non-moving party submitted affidavit of individual familiar with signee's signature); *Shchekina v. Wash. Mut. Bank*, 2012 WL 3245957 at \*2 (N.D. Ill. Aug. 7, 2012) (non-moving party submitted affidavits of forensic document examiner and two colleagues familiar with signee's signature). For reasons known only to the parties, no evidence of this kind has been provided to the Court.

Instead, the question before the Court is whether Mughmaw's ambiguous statements, as related in the Drabek affidavit, are enough to create a genuine issue of material fact in the face of Mughmaw's unsupported, self-serving denial. Mughmaw's arguments in support of summary judgment boil down to her assertion that it is unreasonable to infer that she was referencing the Continuing Agreement when she admitted to "signing on the dotted line." The Court disagrees. It is true, as Mughmaw notes, that "sign on the dotted line" is a widely used idiom which could, divorced from context, reference any number of documents or no documents at all. However, Mughmaw's statement had context. According to Drabek, the statement was made in the context of Mughmaw expressing concern regarding how FFMI's default would affect her financially. Mughmaw does not explain why FFMI's default would have affected her financial situation if she had not agreed to guarantee the debt.

The Court also finds that the document itself gives some credence to the idea that Mughmaw signed the Continuing Guaranty. While the document is not notarized, it does bear the signature of a notary as a witness. *Compare* ECF No. 82-3 at 2; 82-1 at 3. The fact that Mughmaw's signature was purportedly witnessed by a notary is, at least, some evidence that she signed the document. *Krom v. Vermillion*, 41 N.E. 539, 539 (Ind. 1895) (certificate of acknowledgement on a mortgage by an authorized officer "was sufficient prima facie evidence of [the mortgage's]

execution to at least entitle it to be read in evidence."). Moreover, given the limited rights of creditors to satisfy the obligations of one spouse through seizure of marital property, *see Flatrock River Lodge v. Stout*, 130 N.E.3d 96, 101 (Ind. Ct. App. 2019), the Court would expect Ford to require both husband and wife to sign the Continuing Guaranty.

The Court concedes that Ford's evidence is thin but, then again, so is Mughmaw's. As the Seventh Circuit has held, where a motion for summary judgment is supported only by an unverified, self-serving statement, the quantum of evidence necessary to resist that motion is reduced in kind. *Szymanski v. Rite-Way Lawn Maint.*, 231 F.3d 360, 365 (7th Cir. 2000) ("Where the moving party's version of material facts is supported solely by self-serving assertions, self-serving assertions to the contrary by the nonmoving party may be sufficient to create a credibility issue which is best resolved at trial."). The Court finds that a jury is best suited to evaluate Mughmaw's credibility considering the evidence presented by Ford. Accordingly, Mughmaw's motion for summary judgment will be denied.

**3.**    ***Ford is Entitled to Summary Judgment on its Conversion Claims***

In addition to its breach of contract claims, Ford has brought a claim under Ind. Code § 34-24-3-1, commonly known as the Crime Victims Relief Act ("CVRA"). The CVRA provides civil relief for parties that have suffered "a pecuniary loss as a result of a violation of" certain enumerated criminal statutes. *Id*. Damages available under the CVRA include treble damages, costs, attorney fees, and other litigation related expenses. Ford alleges that FFMI's conduct violated Ind. Code § 35-43-4-3, Indiana's criminal conversion statute, one of the criminal statutes enumerated in the CVRA.

To recover under the CVRA on a conversion claim, Ford must prove the elements of criminal conversion by a preponderance of the evidence. Those elements are the knowing or

intentional exertion of unauthorized control over the property of another. I.C. § 35-43-4-3(a); *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious object to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). "A person's control over property of another person is 'unauthorized' if it is exerted in a manner or to an extent other than that to which the other person has consented." Ind. Code § 35-43-4-1(b)(2). A criminal conviction for conversion is not a condition precedent for a claim under the CVRA. *JET*, 879 N.E.2d at 597.

FFMI has raised several challenges to Ford's CVRA claims, which the Court will address in turn. Ultimately, the Court finds none of FFMI's argument's persuasive, and will grant summary judgment in favor of Ford on the conversion counts.

**a.**     *Ford's Conversion Claims are More Than "Attempts to Alchemize a Contract Claim into a Tort"*

Perhaps the clearest line of case law related to the CVRA are the consistent holdings by Indiana courts that the CVRA is not a method for procuring treble damages in simple breach of contract cases. The refusal to pay a debt will, generally, not support a claim under the statute. *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 532 (Ind. Ct. App. 2015). Moreover, Indiana courts do not allow claims for conversion in the context of contract disputes. *JET*, 879 N.E.2d at 597; *French-Tex Cleaners v. Cafaro Co.*, 893 N.E.2d 1156 (Ind. Ct. App. 2008). Relying on this body of law, FFMI argues that Ford's "tort-based claims for conversion and statutory conversion are misplaced and unsustainable when considered in the commercial context under controlling authority." (ECF No. 74 at 17). The Court disagrees.

11

First, this case does not present a good faith dispute as to whether the relevant contracts were breached. *See*, *e.g.*, *French-Tex*, 893 N.E.2d at 1167 (finding that the dispute was one of contract interpretation). FFMI does not dispute that it breached the contracts. Indeed, as discussed below, FFMI's defense to the claim for breach is that it breached the contracts for so long, on so many instances, and so egregiously that Ford should be estopped from claiming breach now. FFMI's attempts to characterize this case as a "contract dispute," then, ring hollow.

But even if this was a contract dispute, those words, in and of themselves, do not bar a claim under the CVRA. Rather, it is the effect they have on the elements of criminal conversion that is important. The criminal conversion statute has clear *mens rea* elements. In an innocent breach of contract or failure to pay a debt, the defendant lacks the necessary *mens rea*. *See JET*, 879 N.E.2d at 597. In this case, there is ample evidence to support the finding of the necessary *mens rea*. Ford has designated evidence that FFMI falsified sales dates of vehicles, submitted fictitious financial reports, and misrepresented its cash on hand. Most egregiously, FFMI kept two sets of books: a false set containing the information provided to Ford; and a real set showing the true financial status of the dealership. This evidence shows that FFMI acted intentionally, and at the very least knowingly, throughout the conduct alleged by Ford.

The Court recognizes that, generally, the intention of a party is a question of fact for a jury. *Maple v. Burnside*, 22 Ind. 139, 142–43 (1864). However, FFMI has not designated any evidence tending to negate a finding of intent. It does not dispute that it falsified sales dates, submitted fictitious financial reports, or misrepresented its cash on hand. It offers no innocent explanation for the two sets of books. Having admitted these facts, the Court finds that there is nothing for a jury to determine.

**b.**    *The Money Owed to Ford Qualifies as a Special Chattel*

Indiana cases interpreting the CVRA in the context of criminal conversion are clear that "money may be the subject of an action for conversion only if it is capable of being identified as a special chattel." *Huff v. Biomet, Inc.*, 654 N.E.2d 830 (Ind. Ct. App. 1995), *abrogated on other grounds by St. Vincent Hosp. & Health Care Ctr., Inc.*, 766 N.E.2d 699 (Ind. 2002). In other words, it must be "a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Trietsch v. Circle Design Grp., Inc.*, 868 N.E.2d 812, 821–22 (Ind. Ct. App. 2007); *see also Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 776 (Ind. Ct. App. 2009) (conversion claim dismissed because plaintiff "did not identify the money at issue as separate chattel"); *Tobin v. Ruman*, 819 N.E.2d 78 (Ind. Ct. App. 2004) (law firm's wrongful withholding of lawyer's share of retained earnings constituted failure to pay a debt and did not constitute criminal conversion as a matter of law). Relying on these cases, FFMI argues that, because FFMI "was under no duty to segregate or earmark the proceeds into a specific escrow account to give the funds 'chattel-like properties," Ford cannot maintain a conversation claim. (ECF No. 74 at 14).

The Court finds that FFMI places far too much significance on the existence or non-existence of a separate bank account. To be sure, it is possible to find Indiana cases where a court considered the existence of an escrow account to be a factor, and even the deciding factor, in determining whether money had "chattel-like properties." *See*, *e.g.*, *Kopis v. Savage*, 498 N.E.2d 1266, 1270 (Ind. Ct. App. 1986) (holding that money was not a special chattel, in part because "the parties did not agree to set up an escrow account"). However, the Court rejects the idea that it can be the *only* factor. To hold as FFMI suggests would be to punish the punctilious thief, who separates his ill-gotten gains from his legitimate ones, while letting an individual less concerned

about bookkeeping off the hook. The Court does not believe that the line of cases relied upon by FFMI calls for these kinds of perverse incentives.

Taking a more holistic view of the special chattel question, the Court finds that the undisputed facts are in Ford's favor. Those facts belie FFMI's claims that the funds were not earmarked for any particular purpose. To the contrary, the Wholesale Agreement expressly required that "[a]ny and all proceeds of any sale, lease, or other disposition of [FFMI's inventory] shall be received and held by [FFMI] in trust for [Ford] and shall be fully, faithfully and promptly accounted for and remitted by [FFMI] to [Ford]." (ECF No. 68-8 at 2). The remittance of the funds to Ford was to repay FFMI's obligation to Ford for loans made under the Wholesale Agreement. (*Id*.). Thus, we have a determinate sum (the purchase price of a vehicle) with which FFMI was entrusted to apply to a certain purpose (repayment of loans under the Wholesale Agreement). This is all that is required to designate the amounts as special chattel. *Trietsch*, 868 N.E.2d at 821–22.

The Court agrees with Ford that the case at bar most closely resembles the Indiana Court of Appeals' decision in *Midland-Guardian Co. v. United Consumer Club, Inc.*, 502 N.E.2d 1354 (Ind. Ct. App. 1987). There, the parties were engaged in an ongoing business relationship in which the defendant purchased installment contracts from the plaintiff. The defendant paid an agreed upon price for the contracts but retained a set percentage of the purchase price for use as a contingency fund. The contingency fund belonged to the plaintiff, subject only to the defendant's right to charge back uncollectible contracts according to a pre-arranged formula. When the defendant retained the amounts in the contingency fund after the termination of the business relationship, a claim under the CVRA was brought.

After initially affirming in part and reversing in part judgment for the plaintiff, *see Midland-Guardian Co. v. United Consumers Club*, 499 N.E.2d 792 (Ind. Ct. App. 1986), the Court

of Appeals made clear, on a petition for rehearing, that the intervening decision in *Kopis* did not

change the analysis.

> These specific funds were, in effect, entrusted to Midland to be separately held and
> accounted for. The holdback reserve agreements did not create an obligation to
> repay a debt, instead they placed Midland in a position of responsibility to return
> the remainder of these separately identified accounts at the appropriate time. It is
> the breach of this trust, by knowingly exercising unauthorized control over UCC's
> property, that led to Midland's being found liable for criminal conversion.

*Midland-Guardian*, 502 N.E.2d at 1355.

While the business is different, the facts of this case fit squarely into the *Midland-Guardian*

analysis. The funds in this case, namely the purchase amounts for vehicles from FFMI's inventory,

were to be "held in trust" and "fully, faithfully and promptly accounted for and remitted by" FFMI.

This is not repayment of debt, but instead an obligation on the part of FFMI to pay discretely

identifiable amounts at the contractually agreed-upon time. It is a breach of this duty that gives

rise to FFMI's liability under the CVRA.

**c.**     *The Economic Loss Doctrine does not Apply to this Dispute*

Finally, FFMI claims that Ford's CVRA claim runs afoul of Indiana's economic loss

doctrine. Generally, the economic loss rule states:

> damage from a defective product or service may be recoverable under a tort theory
> if the defect causes personal injury or damage to other property, but contract law
> governs damage to the product or service itself and purely economic loss arising
> from the failure of the product or service to perform as expected.

*Indianapolis–Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 728

(Ind. 2010) (citation omitted).

In explaining the rule, the Indiana Supreme Court has stated that "the economic loss rule

reflects that the resolution of liability for purely economic loss caused by negligence is more

appropriately determined by commercial rather than tort law." *Id*. at 729. Limiting a recovery of

such purely pecuniary losses to commercial law serves to ensure the application of warranty and other commercial rules, whereas a remedy at tort would allow a plaintiff buyer "'to circumvent the seller's effective limitation or exclusion of warranties under [the Uniform Commercial Code], and subject[] manufacturers to liability for damages of unknown and unlimited scope.'" *Id*. (quoting *Reed v. Central Soya Co., Inc*., 621 N.E.2d 1069, 1075 (Ind. 1993)). The economic loss rule serves a second purpose related to the question of unlimited scope of damages: use of tort remedies may create "'a potential for liability so uncertain in time, class, or amount that [a defendant should not be] fairly or practically expected to account for the potential liability when undertaking the conduct that gives rise to it.'" *Id*. at 730 (quoting Restatement (Third) of Economic Torts and Related Wrongs § 8, cmt. d(2) (Council Draft No. 2, 2007)).

The Court finds no Indiana cases applying the economic loss doctrine to claims under the CVRA, and with good reason. Rather than being a bar to a CVRA claim, pecuniary loss is the gravamen of the claim. *Banks v. Jamison*, 12 N.E.3d 968, 983 (Ind. Ct. App. 2014) ("A person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss."); I.C. § 34-24-31. It is the pecuniary loss suffered by Ford that gives rise to its ability to state a claim under the CVRA.

The Court also notes that referring to a claim under the CVRA as a tort claim is somewhat inapposite. While it is possible to find cases that refer to the claim in this way, *State Grp. Indus. (USA) Ltd. v. Murphy & Assocs. Indus. Servs., Inc.*, 878 N.E.2d 475, 480 (Ind. Ct. App. 2007), a CVRA claim is not based upon any common law tort theory. Rather, it is a statutory remedy based upon the violation of a criminal statute. This is not, then, a case where a party is attempting to bring a negligence suit in addition to a breach of contract claim, the normal case in which the economic loss doctrine is invoked. *Indianapolis-Marion*, 929 N.E.2d at 729; *KB Home Indiana*

16

*Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 303–04 (Ind. Ct. App. 2010); *Greg Allen Const. Co., Inc. v. Estelle*, 798 N.E.2d 171, 175 (Ind. 2003). Simply put, the economic loss doctrine has no application here.

**4.     *Ford is Entitled to Summary Judgment on its Breach of Contract Claims***

FFMI breached the Wholesale Agreement and the Security Agreement. This is not disputed. Instead, FFMI asserts that its long history of breaching those agreements, going back to 2012, should bar Ford from bringing an action for breach now. The Court disagrees and finds that FFMI is liable for its undisputed breaches.

**a.     *FFMI Cannot Demonstrate Waiver***

FFMI's general position, that a party can waive its right to assert breach of contract, is correct. Waiver is an intentional abandonment or relinquishment of a known right; with reference to a breach of contract, it includes giving up the right to treat the contract as breached by the other party. *Waxman Indus., Inc. v. Trustco Dev. Co.*, 455 N.E.2d 376, 378 (Ind. Ct. App. 1983). Strict performance of the terms of a contract on the part of one party may be waived by the other by acts which show a relinquishment of one or more provisions of the contract. *Clark Mut. Life Ins. Co. v. Lewis*, 217 N.E.2d 853, 857 (Ind. Ct. App. 1966). Whether there has been a waiver is determined solely by the actions of the party holding the contractual right, without reference to any act or conduct of the other party. *Templer v. Muncie Lodge*, 97 N.E. 546, 549 (Ind. Ct. App. 1912).

FFMI bases its waiver argument on the monthly financial reports it sent to Ford, particularly those sent from 2012 forward. According to Matthew Fincannon and Stanley Bourff, those reports indicated that FFMI was "operating 'out of trust' given the large negative balance of the value of its vehicles. The same financial statements revealed that [FFMI] was struggling financially." (ECF No. 78-7 at 3). The men further assert that, not later than December 2012, Ford

17

"knew or should have known that [FFMI] was operating 'out of trust' based on the monthly financial statements provided to" Ford. (*Id*.). This purported knowledge, coupled with Ford's inaction over the course of the next seven years, forms the basis for FFMI's waiver argument.

The Court sees at least two problems with FFMI's line of reasoning. First, FFMI has failed to establish the existence of a single breach prior to those discovered by Ford. Both Michael Fincannon and Stanley Bourff testified that, considering FFMI's financial statements, Ford "knew or should have known that [FFMI] was operating "out of trust" "[n]o later than December 2012." (ECF No. 74-2 at 3). Neither men explain what they mean by "operating 'out of trust.'" The Court understands that individual sales can be "out of trust" when the proceeds are not remitted as required by the Wholesale Agreement. (ECF No. 79 at 8). But neither Fincannon nor Bourff point to a single sale that was out of trust. The Court has reviewed the monthly financial statements provided by FFMI (ECF No. 74-2 at 10–26), and they do not show proceeds or remittances for individual vehicles. Neither Fincannon nor Bourff explain how Ford was to conclude, from little more than reports showing negative equity, that any individual sales were out of trust.

If FFMI cannot explain to the Court how the financial statements show that FFMI had breached the Wholesale Agreement, the Court cannot conclude that Ford was aware of any such breaches, much less that it intentionally abandoned its right to declare breach for selling vehicles out of trust. The Court has no doubt that Ford was aware FFMI had negative equity on its inventory. It further has no doubt that Ford was aware FFMI was in financial difficulty. But this is not the same as knowing FFMI had failed to make payments when due and owing or any other act that would have constituted a breach of the Wholesale Agreement. Without evidence demonstrating knowledge of breach and intent to forego contractual rights, FFMI cannot avoid the consequences of the breaches discovered in November 2019.

But even if Ford was aware of specific instances where FFMI had sold vehicles out of trust, and even if Ford had waived its right to declare breach on that ground, FFMI breached the agreements in other ways. FFMI encumbered Ford's collateral through the execution of the factoring agreements. FFMI failed to disclose the factoring agreements to Ford, and otherwise submitted false and misleading financial reports. FFMI maintained two sets of financial records. Each of these acts constituted a breach of the plain terms of the Wholesale Agreement. Thus, even if Ford had waived its right to assert breach on one ground, the other grounds remained valid. *See Farm Equip. Store, Inc. v. White Farm Equip. Co.*, 596 N.E.2d 274, 277 (Ind. Ct. App. 1992) (holding that waiver of one part of the contract does not automatically result in a wholesale waiver of other provisions in the contract).

"If not properly contained, the doctrine of waiver can seriously damage the security and predictability that the law provides for parties to a written contract. For this reason, courts confronted with contractual waiver arguments must take care to prevent unintentional expansion of the doctrine." *Knopick v. Jayco, Inc.*, 895 F.3d 525, 530 (7th Cir. 2018) (citation omitted). Here, the only evidence of waiver is Fincannon and Bourff's baseless speculation regarding what Ford knew or should have known. This kind of evidence cannot create a genuine issue of material fact, *Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 663 n.12 (N.D. Ind. 2006), and certainly is not enough to alter the terms of a contract that had governed the parties' relationship for nearly four decades.

**b.**     *FFMI has Failed to Raise a Cogent Argument Related to Estoppel*

FFMI next claims that Ford's breach of contract claim is barred by estoppel. Relying on a single case discussing general estoppel principles, FFMI's argument is confined to a single sentence: "Alternatively, [Ford] is estopped from pursuing damages under the Wholesale

Agreement because [Ford's] continued affirmative actions and failure to declare default against [FFMI] induced [FFMI] to continue operating 'out of trust' and obtain third-party financing allegedly in violation of the Wholesale Agreement and Security Agreement." (ECF No. 74 at 24).

FFMI speaks of estoppel as if it was a unitary theory of avoidance. However, the very case FFMI relies upon demonstrates that there are many varieties of estoppel, including: "estoppel by record, estoppel by deed, collateral estoppel, equitable estoppel–also referred to as estoppel *in pais*, promissory estoppel, and judicial estoppel." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). Each of those varieties has different elements. *Id.* (listing elements of promissory estoppel); *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 884 (Ind. Ct. App. 2016) (equitable estoppel); *Adams v. Marion Cty. Office of Family and Children*, 659 N.E.2d 202, 205 (Ind. Ct. App. 1995) (collateral estoppel); *Hay v. Baumgartner*, 903 N.E.2d 1044, 1049 (Ind. Ct. App. 2009) (judicial estoppel).

On which kind of estoppel does FFMI rely? What facts demonstrate that Ford's conduct satisfies the elements of that brand of estoppel? FFMI does not say. While the Court could hazard a guess, it sees no reason to do so given the fact that FFMI is represented by counsel. As noted above, the Court is not obliged to scour the record and/or case law to manufacture an argument for the parties. *Nelson*, 657 F.3d at 590. It will not do so here.

**5.      *Ford has Failed to Carry its Summary Judgment Burden with Respect to Damages***

The final issue before the Court is damages. In support of its request for summary judgment on damages, Ford has submitted the affidavit of Bryan W. Banks, one of its Regional Managers. Banks declares that the total amount of Ford's damages, excluding attorneys' fees, is $1,387,554.46. (ECF No. 68-7 at 6). However, Banks does not disclose how he arrived at that number: no supporting documentation is referenced or provided. According to FFMI, this

constitutes a failure on the part of Ford to carry its summary judgment burden with respect to damages.

The Court agrees with FFMI. Because Ford would have the burden of proof on damages at trial, it must show "through affirmative evidence that there is no genuine dispute." *Property Owners Ins. Co. v. Cope*, 772 F. Supp. 1096, 1098 (N.D. Ind. 1991). This means that Ford must set forth enough evidence to prove "with reasonable certainty the damages which [it] incurred due to the breach" "without resorting to speculation or conjecture." *Entm't USA, Inc. v. Moorehead Commc'n, Inc.*, 897 F.3d 786, 793 (7th Cir. 2018). A damages affidavit, unsupported by exhibits and failing to explain how numbers have been calculated, fails to meet this burden. *Trs. of Ind. Elec. Workers Pension Tr. Fund IBEW v. Darnell, Inc.*, 2020 WL 735696 at *1–2 (N.D. Ind. Feb. 13, 2020).

The Court would assume that Banks' calculations are based on any number of documents, including spreadsheets showing out of trust vehicle sales and proceeds from the auctioning of collateral. But basing a judgment on Banks' affidavit would be just that: an assumption. Based on the paucity of evidence in the record on Ford's damages, the Court concludes that a trial is necessary.

## C.  Conclusion

For the foregoing reasons, Defendant Linda Mughmaw's Motion for Summary Judgment (ECF No. 76) and Defendants Fincannon Ford-Mercury, Inc.'s Cross-Motion for Summary Judgment (ECF No. 73) are DENIED. Plaintiff Ford Motor Credit Company's Motion for Summary Judgment (ECF No. 68) is GRANTED with respect to liability only and is DENIED with respect to damages.

SO ORDERED on April 12, 2021.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT