**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| FORD MOTOR CREDIT COMPANY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No.: 1:19-CV-00502-HAB-SLC |
| | ) | |
| FINCANNON FORD, INC., f/k/a | ) | |
| FINCANNON FORD-MERCURY, INC., | ) | |
| LINDA MUGHMAW, a/k/a | ) | |
| LINDA FINCANNON, | ) | |
| MATTHEW FINCANNON, and | ) | |
| STANLEY BOURFF, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT**

This matter came before the Court on November 9, 2022, to determine the damages

sustained by plaintiff Ford Motor Credit Company LLC ("Ford Credit") as a result of the

fraud committed by defendants Matthew Fincannon ("Mr. Fincannon") and Stanley Bourff

("Mr. Bourff" and, together with Mr. Fincannon, "Defendants").  At the hearing, Ford

Credit presented the testimony of two witnesses—Deborah Drabek ("Ms. Drabek"), a Ford

Credit financial services specialist who discovered Defendants' fraud, and Gilbert Roberts

("Mr. Roberts"), a credit risk analyst at Ford Credit that oversaw the liquidation of Ford

Credit's collateral and mitigation efforts.

Based on Ms. Drabek's and Mr. Roberts' testimony, together with the evidence

introduced during the hearing, the Court now finds as follows:

## FINDINGS OF FACT[1]

### A.    Background

1.    Ford Credit commenced the above-captioned action on November 26, 2019 seeking: (1) damages from defendant Fincannon Ford, Inc. ("Fincannon Ford") for breach of contract; (2) damages from defendant Linda Mughmaw ("Ms. Mughmaw") for breach of guaranty; and (3) replevin of certain secured collateral from Fincannon Ford.  *See* Dkt. 1.

2.    Defendants World Global Capital, LLC ("WGC") and Green Capital Funding ("GCF") were initially named as defendants because of their potential interest in certain secured collateral subject to Ford Credit's replevin claim, and for which Ford Credit held a first-priority, properly-perfected security interest.  *See id.*

3.    On January 31, 2020, Ford Credit filed an amended complaint to reflect a resolution of any claims by or between Ford Credit, WGC, and GCF.  *See* Dkt. 43.

4.    On July 17, 2020, Ford Credit filed a motion for leave to file a second amended complaint, seeking permission to add claims against Mr. Fincannon and Mr. Bourff for breach of contract and fraud.  *See* Dkt. 52.

5.    The Court granted Ford Credit's motion, and Ford Credit filed its second amended complaint on August 5, 2020.  *See* Dkt. 54.

6.    Ford Credit's second amended complaint was served on Mr. Fincannon and Mr. Bourff on August 15, 2020.  *See* Dkts. 57-58.

7.    Mr. Fincannon and Mr. Bourff did not appear or timely file an answer to Ford Credit's second amended complaint.

---

[1] Any finding of fact will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

8.      On September 15, 2020, Ford Credit filed an application for Clerk's entry of default against Mr. Fincannon and Mr. Bourff.  *See* Dkt. 59.

9.      On September 16, 2020, the Clerk for the United States District Court for the Northern District of Indiana, Fort Wayne Division entered default against Mr. Fincannon and Mr. Bourff pursuant to Federal Rule of Civil Procedure 55(a).  *See* Dkt. 60.

10.     On October 23, 2020, Ford Credit filed a motion for default judgment against Mr. Fincannon and Mr. Bourff.  *See* Dkt. 61.

11.     On October 29, 2020, the Court granted in part, and denied in part, Ford Credit's motion for default judgment, entering default judgment against Mr. Fincannon and Mr. Bourff on liability, but staying any damages award "until the liability of the remaining Defendants [including Fincannon Ford and Ms. Mughmaw] is determined." *See* Dkt. 63.

12.     In the Court's Opinion and Order granting Ford Credit's motion for default judgment, the Court held, based on the allegations in Ford Credit's complaint, that Mr. Fincannon and Mr. Bourff were liable for fraudulently concealing the financial status of Fincannon Ford by "preparing false financial reports and keeping separate ledgers." *See* Dkt. 63, at 5.

13.     Ford Credit, Fincannon Ford, and Ms. Mughmaw litigated the claims by and between them through summary judgment motions, a stipulated judgment, and an Order on August 26, 2022 dismissing Fincannon Ford and Ms. Mughmaw as Defendants from the action.  *See* Dkt. 119.

14.     The Court's August 26, 2022 Order left only Ford Credit's breach of contract and fraud claims against Mr. Fincannon and Mr. Bourff.

15.     On September 29, 2022, Ford Credit provided notice to Mr. Fincannon and Mr. Bourff that a damages hearing concerning those remaining claims was scheduled on November 9, 2022 at 1:00 p.m. at the United States District Court for the Northern District of Indiana, Fort Wayne Division, located at 1300 S. Harrison Street, Fort Wayne, Indiana.  *See* Dkt. 124, Exhibit A.

16.     The damages hearing was held as scheduled, and neither Mr. Fincannon nor Mr. Bourff appeared.  *See* Dkt. 125.

17.     At the conclusion of that hearing, the Court granted Ford Credit's motion to dismiss its breach of contract claim against Mr. Fincannon and Mr. Bourff, leaving Ford Credit's fraud claim as the only remaining claim against Mr. Fincannon and Mr. Bourff.  *See id.*

18.     The Court also ordered Ford Credit to submit its proposed findings of fact and conclusions of law concerning damages arising from its fraud claim against Mr. Fincannon and Mr. Bourff on or before January 23, 2023.  *See id.*

**B.      Ford Credit's audit at Fincannon Ford and the dealership's stopped payment**

19.     Prior to November 2019, Ford Credit provided wholesale financing to Fincannon Ford for the dealership's use in financing the purchase of new and used motor vehicles.  *See* Dkt. 129, at 16:4-9.

20.     In exchange for wholesale financing provided by Ford Credit, Fincannon Ford was obligated to, among other things, pay Ford Credit back upon the sale of vehicles financed through Ford Credit.  *See id.*, at 10:3-11.

21.     Fincannon Ford was also obligated to provide monthly financial statements to Ford Credit to facilitate Ford Credit's analysis of the dealership's financial

health and Ford Credit's  determination about whether to continue providing wholesale financing to the dealership.  *See id.*, at 10:18-12:25.

22.    In November 2019, Ford Credit conducted an audit of the vehicle inventory at Fincannon Ford.  *See id.*, at 19:2-10.

23.    As a result of the audit, Ford Credit determined that certain amounts were due and owing from Fincannon Ford.  *See id.*  However, Fincannon Ford subsequently stopped payment on a dealer electronic funds transfer ("DEFT") of the amounts owed by the dealership to Ford Credit.  *See id.*, at 16:14-17:3.

**C.    Fincannon Ford misrepresented and concealed financial information**

24.    Ford Credit financial services specialist Deborah Drabek was sent to the dealership in response to the stopped DEFT.  *See id.*, at 17:20-18:4.

25.    At Fincannon Ford, Ms. Drabek conducted a cash balance reconciliation using the dealership's financial records.  *See id.*, at 18:13-24; *see also* Hearing Exhibit 14.

26.    Ms. Drabek's cash balance reconciliation revealed that certain balances in Fincannon Ford's financial statements could not be reconciled.  *See* Dkt. 129, at 21:15-24.

27.    Fincannon Ford's office manager subsequently provided Ms. Drabek a separate, handwritten ledger of balances entries.  *See id.*, at 21:19-22:13; *see also* Hearing Exhibit 14.

28.    The separate balance entries included information wrongfully omitted from monthly financial statements previously provided by Fincannon Ford to Ford Credit. Dkt. 129, at 22:11-22.

29.     The entries were hidden from Ford Credit intentionally and at the direction of Mr. Bourff.  *See id.*, at 23:6-12.

30.     The balance entries omitted from Fincannon Ford's monthly financial statements dated as far back as December 31, 2018 (then totaling $908,227.99), and they continued through November 2019 (finally totaling $1,377,732.99).  *See id.*, at 23:13-24:14.

31.     Fincannon Ford was obligated to disclose the omitted balances to Ford Credit in its monthly financial statements but, at the direction of Mr. Bourff, it did not.  *See id.*, at 24:15-22, 31:2-10; *see also* Hearing Exhibits 1-11.

32.     As part of her cash balance reconciliation, Ms. Drabek subsequently discovered that Fincannon Ford had also entered into loan agreements with WGC and GCF.  *See* Dkt. 129, at 31:16-24.

33.     The loans bore high interest rates and required frequent payments withdrawn directly from Fincannon Ford's bank accounts.  *See id.*, at 32:4-11; *see also* Hearing Exhibits 12-13.

34.     Fincannon Ford entered into the WGC loan agreement in June 2019 and the GCF loan agreement in October 2019.  *See* Hearing Exhibits 12-13.

35.     Fincannon Ford was obligated to disclose the existence of these loans to Ford Credit in its monthly financial statements.  *See* Dkt. 129, at 33:22-24.

36.     But like the hidden balance entries, it did not.  *See id.*, at 33:19-21, 36:14-16; *see also* Hearing Exhibits 6, 10.

37.     Ms. Drabek subsequently reviewed sales paperwork for three vehicles identified during the November 2019 audit as having wholesale financing balances due to Ford Credit.  *See* Dkt. 129, at 38:8-16.

38.     During the audit, "assignment of proceeds" requests were submitted for the three vehicles, claiming that they had been recently sold to a commercial buyer, that the dealership had not yet received payment, and that Fincannon Ford needed additional time to pay off the wholesale balance owed to Ford Credit.  *See id.*, at 38:17-39:16; *see also* Hearing Exhibit 15.

39.     But when Ms. Drabek compared the "assignment of proceeds" requests and the sales paperwork for the three vehicles, she determined that they had actually been sold as early as October 2018, more than one full year prior.  *See* Dkt. 129, at 44:13-45:15; *see also* Hearing Exhibit 15.

40.     Further, contrary to the representations in the "assignment of proceeds" requests, Fincannon Ford had, in fact, been paid for the vehicles.  *See* Dkt. 129, at 45:16-22; *see also* Hearing Exhibit 15.

41.     Despite having received payment, Fincannon Ford had failed to timely pay amounts owed to Ford Credit for the wholesale financing for each of the three vehicles.  *See* Dkt. 129, at 45:23-25.

42.     During her review of Fincannon Ford's financial records, Ms. Drabek also discovered that Mr. Fincannon and Mr. Bourff had each taken cash advances out of the dealership to pay for personal expenses.  *See id.*, at 48:10-17.

43.     Such personal expenses included Mr. Bourff's personal property taxes and Mr. Fincannon for personal home expenses.  *See id.*, at 48:18-24.

44.     The cash advances taken out of Fincannon Ford by Mr. Bourff and Mr. Fincannon were improperly hidden on the dealership's financial statements as accounts

receivable associated with Fincannon Ford's parts and service department. *See id.*, at 50:8-51:17.

45.    In her review of the dealership's financial statements, Ms. Drabek determined that the hidden cash advances existed as far back as July 2019, but likely predated that. *See id.*, at 52:18-53:6.

46.    Ultimately, Ms. Drabek's review of Fincannon Ford's business records revealed financial information withheld from, or misrepresented to, Ford Credit throughout the entirety of 2019 and misreported vehicle sales dating as far back as October 2018. *See id.*, at 53:12-54:22.

47.    Ford Credit would not have maintained a lending relationship with Fincannon Ford in 2019 if it had been aware of the financial information being withheld and misrepresented. *See id.* at 37:3-18, 52:9-17.

**D.    Wholesale financing from Ford Credit to Fincannon Ford in 2019 and wholesale financing for vehicles with misrepresented sales date**

48.    After the audit at Fincannon Ford, Ford Credit maintained a Status Inventory Notebook tracking all new and used vehicle inventory on Fincannon Ford's wholesale financing lines. *See id.*, at 62:21-63:13; Hearing Exhibit 16.

49.    Before liquidating its secured collateral at Fincannon Ford, including the dealership's new and used vehicle inventory, the total outstanding wholesale financing due from Fincannon Ford to Ford Credit was $7,526,232.88. *See* Dkt. 129, at 68:5-21; *see also* Hearing Exhibit 16, p. 7.

50.    Of that total, $7,031,504.68 was attributable to Fincannon Ford's 2019 wholesale financing line (including a handful of vehicles not received by the dealership until early 2020). *See* Dkt. 129, at 76:4-21, 79:7-23; *see generally* Hearing Exhibit 16.

51.     Meanwhile, $45,994.08 was attributable to a vehicle for which the dealership received wholesale financing in 2018, but for which: (1) a fraudulent "assignment of proceeds" request was submitted misrepresenting the vehicle's sales date; and (2) repayment to Ford Credit wrongfully withheld.  *See* Dkt. 129, at 82:25-83:9; *see also* Hearing Exhibits 15-16.

52.     Thus, the total wholesale financing provided by Ford Credit to Fincannon Ford in 2019, together with wholesale financing for the vehicle for which sales date was misrepresented and repayment to Ford Credit wrongfully withheld, was $7,077,498.76.  *See* Dkt. 129, at 83:23-84:9.

**E.      Ford Credit's liquidation of its secured collateral**

53.     After the audit at Fincannon Ford and discovery of fraud, Ford Credit liquidated its secured collateral at the dealership, including the new and used vehicle inventory and furniture, fixtures, and equipment.  *See id.*, at 84:10-25.

54.     Ford Credit's liquidation included: (1) selling vehicles and parts to other dealerships; (2) selling other vehicles, furniture, fixtures, and equipment at auction; and (3) selling certain vehicles to ordinary customers.  *See id.*, at 85:1-19.

55.     Ford Credit incurred $117,265.19 in on-site monitoring expenses necessary to ensure the security of its collateral during the containment and liquidation process.  *See* Dkt. *id.*, at 95:2-96:2; *see also* Hearing Exhibit 19.

56.     Ford Credit tracked the net proceeds recovered from the liquidation of its secured collateral in a Receipt Log.  *See* Dkt. 129, at 91:12-92:23; Hearing Exhibit 18.

57.     At the conclusion of the liquidation process, Ford Credit's net proceeds totaled $6,551,369.56.  *See* Dkt. 129, at 93:3-94:2; *see generally* Hearing Exhibit 18.

58.     After incorporating on-site monitoring expenses and applying the net liquidation proceeds, the total loss sustained by Ford Credit for wholesale financing provided by Ford Credit to Fincannon Ford in 2019, together with wholesale financing for the vehicle for which sales date was misrepresented and repayment to Ford Credit wrongfully withheld, was $643,394.39. *See* Dkt. 129, at 94:3-23, 97:23-98:10.

59.     Ford Credit's total loss is summarized as follows:

| | |
|---|---:|
| Wholesale financing provided by Ford Credit in 2019 | $7,031,504.68 |
| Wholesale financing provided by Ford Credit in 2018 for vehicle with sales date misrepresented in 2019 | $45,994.08 |
| On-site monitoring expenses | $117,265.19 |
| Net proceeds from liquidated secured collateral | -$6,551,369.56 |
| **TOTAL:** | **$643,394.39** |

## CONCLUSIONS OF LAW

1.     When liability is established by default, defaulting parties are liable for "those damages that arise from the acts and injuries that are pleaded." *Wine & Canvas Dev. LLC v. Weisser*, 2015 WL 1969449, at *5 (S.D. Ind. May 1, 2015) (citing *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012)).

2.     Plaintiffs are, accordingly, entitled to recover damages proximately caused by such pleaded acts and injuries. *See id.* at *6.

3.     At a damages hearing after default judgment is entered on liability, parties seeking final judgment "must provide evidence supporting the damages claimed." *Id.* (quoting *Al–Kazemi v. General Acceptance & Inv. Corp.*, 633 F. Supp. 540, 542 (D.D.C.

1986) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1324

(7th Cir. 1983)).

4. A party injured by another party's fraud is "entitled to compensation

for damages suffered as a result of the fraudulent representation." *Hi-Tec Props., LLC v.*

*Murphy*, 14 N.E.3d 767, 777 (Ind. Ct. App. 2014); *see generally J & J Sports Prods., Inc. v.*

*Kikalos*, 2015 WL 2412500, at *5-6 (N.D. Ind. May 21, 2015) (generally describing damages

recoverable for common law and statutory fraud claims).

5. "Damages for fraud are those which are the natural and proximate

consequences of the act complained of." *Hi-Tec Props., LLC*, 14 N.E.3d at 777.

6. An injured party must exercise care to mitigate its damages. *See*

*generally Foster v. Owens*, 844 N.E.2d 216, 221 (Ind. Ct. App. 2006).

7. Efforts to mitigate damages reduce the amount of damages a plaintiff

is entitled to recover after a defendant's liability has been established. *See generally Duneland*

*Props., LLC. v/ Northern Ind. Pub. Serv. Co.*, 14 N.E.3d 95, 101 (Ind. Ct. App. 2014).

8. In its Order partially granting Ford Credit's motion for default

judgment, the Court found that Mr. Fincannon and Mr. Bourff are liable to Ford Credit for

"preparing false financial reports and keeping separate ledgers" and fraudulently concealing

the financial status of Fincannon Ford. See Dkt. 63, at 5.

9. The testimony and evidence presented at the damages hearing on

November 9, 2022 establishes that the fraud orchestrated at Fincannon Ford by Mr.

Fincannon and Mr. Bourff began as early as December 31, 2018 and included at least one

vehicle for which the sales date and payoff were misrepresented and withheld since October

2018.

10. The testimony and evidence also establishes that the losses suffered by Ford Credit as a direct result of the fraud include: (1) wholesale financing provided to Fincannon Ford in 2019; (2) wholesale financing provided to Fincannon Ford in 2018 for the vehicle with misrepresented sales date and wrongfully withheld payoff; and (3) expenses related to Ford Credit's on-site monitoring of its collateral during the containment and liquidation process.

11. Finally, the testimony and evidence establishes that Ford Credit's losses were subsequently reduced by the net proceeds recovered by Ford Credit in liquidating its secured collateral from Fincannon Ford.

## JUDGMENT

Based on the foregoing, this Court enters judgment against Matthew Fincannon and Stanley Bourff, jointly and severally, on the fraud claim asserted by Ford Credit in the amount of $643,394.39.

SO ORDERED on March 31, 2023.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT